1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT
9               CENTRAL DISTRICT OF CALIFORNIA
10
11  CHRISTOPHER U.,                    )    Case No. SA CV 16-1783-SP
12              Plaintiff,             )
                                       )    MEMORANDUM OPINION AND
13          v.                         )    ORDER
                                       )
14                                     )
15  NANCY A. BERRYHILL, Deputy         )
    Commissioner for Operations of Social )
    Security Administration,           )
16                                     )
17              Defendant.             )
    _____)
18
19                          **I.**
20                   <u>**INTRODUCTION**</u>
21          On September 26, 2016, plaintiff Christopher U. filed a complaint against
22  defendant, Commissioner of the Social Security Administration ("Commissioner"),
23  seeking a review of a denial of period of disability, disability insurance benefits
24  ("DIB"), child's insurance benefits ("CIB"), and supplemental security income
25  ("SSI"). Both parties have consented to proceed for all purposes before the
26  assigned Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court deems the
27  matter suitable for adjudication without oral argument.
28

                                   1

Plaintiff presents three general issues for decision: (1) whether the Administrative Law Judge ("ALJ") properly considered the medical opinions when she: (a) gave little weight to the opinions of treating and examining physicians of Dr. Alejandro Alva and Dr. George Popper; (b) did not consider in detail the Global Assessment of Functioning scores by Dr. Adamu Salisu; and (c) credited the state agency opinions over the aforementioned opinions; (2) whether the ALJ adequately assessed plaintiff's testimony; and (3) whether the ALJ adequately considered plaintiff's mother's statements. Memorandum in Support of Plaintiff's Complaint ("P. Mem.") at 1-17.

Having carefully studied the parties' written submissions, the decision of the ALJ, and the Administrative Record ("AR"), the court concludes that, as detailed herein, the ALJ properly considered the medical opinions and evidence, and properly discounted the testimony of plaintiff and his mother. Consequently, the court affirms the decision of the Commissioner denying benefits.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who was eighteen years old on his alleged disability onset date, completed his first year in college. AR at 40, 41, 200, 2017. He has no past relevant work. *Id.* at 71.

On November 20, 2013, plaintiff filed applications for disability insurance benefits, supplemental security income, and child's insurance benefits. *Id.* at 78, 89, 100. In the applications, plaintiff alleges he has been disabled since September 23, 2012 due to bipolar disorder with psychosis, anxiety, and attention deficit order. *Id.* The Commissioner denied plaintiff's applications, after which plaintiff filed a request for reconsideration, which was denied. *Id.* at 156-60. Plaintiff then filed a request for a hearing. *Id.* at 161.

On June 25, 2015, plaintiff, represented by counsel, appeared and testified at a hearing before the ALJ. *Id.* at 37-77. The ALJ also heard testimony from

Jeanine Metildi, a vocational expert ("VE"). *Id.* at 70-75. On July 31, 2015, the ALJ denied plaintiff's claim for benefits. *Id.* at 18-30.

Applying the well-known five-step sequential evaluation process, the ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity since September 23, 2012, the alleged onset date. *Id.* at 20.

At step two, the ALJ found plaintiff suffered from the following severe impairments: schizoaffective disorder, attention deficit hyperactivity disorder, history of drug-induced psychotic disorder with delusions, and bipolar I disorder. *Id.* at 21.

At step three, the ALJ found plaintiff's impairments, whether individually or in combination, did not meet or medically equal the severity of one of the listed impairments set forth in 20 C.F.R. part 404, Subpart P, Appendix 1 (the "Listings"). *Id.*

The ALJ then assessed plaintiff's residual functional capacity ("RFC"),[1] and determined that plaintiff had the RFC to perform a full range of work at all exertional levels but with the non-exertional limitations that plaintiff: was limited to work involving simple, routine, and repetitive tasks; was able to sustain attention and concentration skills sufficient to carry out work-like tasks with reasonable pace and persistence; and could only occasionally interact with co-workers, supervisors, and the general public. *Id.* at 23.

The ALJ found, at step four, that plaintiff had no past relevant work. *Id.* at 28.

---

[1]    Residual functional capacity is what a claimant can do despite existing exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152, 1155-56 n.5-7 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007).

At step five, the ALJ determined that given plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that plaintiff could perform, including cleaner II, bottling line attendant, and punch board assembler. *Id.* at 28-29. Consequently, the ALJ concluded plaintiff did not suffer from a disability as defined by the Social Security Act. *Id.* at 29.

Plaintiff filed a timely request for review of the ALJ's decision, which was denied by the Appeals Council. *Id.* at 1-6, 14. The ALJ's decision stands as the final decision of the Commissioner.

## III.

## STANDARD OF REVIEW

This court is empowered to review decisions by the Commissioner to deny benefits. 42 U.S.C. § 405(g). The findings and decision of the Commissioner must be upheld if they are free of legal error and supported by substantial evidence. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001) (as amended). But if the court determines the ALJ's findings are based on legal error or are not supported by substantial evidence in the record, the court may reject the findings and set aside the decision to deny benefits. *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001).

"Substantial evidence is more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. Substantial evidence is such "relevant evidence which a reasonable person might accept as adequate to support a conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Mayes*, 276 F.3d at 459. To determine whether substantial evidence supports the ALJ's finding, the reviewing court must review the administrative record as a whole, "weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion." *Mayes*, 276 F.3d at 459. The ALJ's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"

*Aukland*, 257 F.3d at 1035 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). If the evidence can reasonably support either affirming or reversing the ALJ's decision, the reviewing court "'may not substitute its judgment for that of the ALJ.'" *Id.* (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)).

## IV.

## DISCUSSION

### A.     The ALJ Properly Considered the Medical Evidence and Physicians' Opinions in the Record

Plaintiff argues the ALJ erred in evaluating the medical opinions and evidence in four respects: (1) she did not properly consider the opinion of treating physician Dr. Alva in giving it little weight; (2) she did not properly consider the opinion of examining physician Dr. Popper in giving it little weight; (3) she failed to properly consider the Global Assessment of Functioning ("GAF") scores determined by Dr. Salisu; and (4) she erred in giving significant weight to the opinions of non-examining physicians Drs. Balson and Fair. P. Mem. at 1-14.

In determining whether a claimant has a medically determinable impairment, among the evidence the ALJ considers is medical evidence. 20 C.F.R. § 404.1527(b).[2] In evaluating medical opinions, the regulations distinguish among three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 404.1527(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (as amended). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. § 404.1527(c)(1)-(2).

---

[2]    The Social Security Administration issued new regulations effective March 27, 2017. Unless otherwise stated, all regulations cited in this decision are effective for cases filed prior to March 27, 2017.

The opinion of the treating physician is generally given the greatest weight because the treating physician is employed to cure and has a greater opportunity to understand and observe a claimant. *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Nevertheless, the ALJ is not bound by the opinion of the treating physician. *Smolen*, 80 F.3d at 1285. If a treating physician's opinion is uncontradicted, the ALJ must provide clear and convincing reasons for giving it less weight. *Lester*, 81 F.3d at 830. If the treating physician's opinion is contradicted by other opinions, the ALJ must provide specific and legitimate reasons supported by substantial evidence for rejecting it. *Id.* at 830. Likewise, the ALJ must provide specific and legitimate reasons supported by substantial evidence in rejecting the contradicted opinions of examining physicians. *Id.* at 830-31. The opinion of a non-examining physician, standing alone, cannot constitute substantial evidence. *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993).

But "[u]nless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician," just as the ALJ "must do for any opinions from treating sources, nontreating sources, and other nonexamining sources." 20 C.F.R. § 416.927(e)(2)(ii). The ALJ "may not ignore these opinions and must explain the weight given to these opinions in their decisions." Social Security Ruling ("SSR") 96-6p.[3]

---

[3] "The Commissioner issues Social Security Rulings to clarify the Act's implementing regulations and the agency's policies. SSRs are binding on all components of the SSA. SSRs do not have the force of law. However, because

6

### 1. **Medical Treatment and Opinions**

#### a. **Treating Physicians**

#### **Dr. Ravinder Singh**

Plaintiff was admitted to St. Joseph Hospital on September 24, 2012 on 5150 psychiatric hold for being a danger to others. AR at 303. Until his discharge on October 2, 2012 he was treated by Ravinder Singh, M.D. *Id.* at 291-305. At the time of discharge Dr. Singh diagnosed him as having bipolar disorder with psychotic features and attention deficit hyperactivity disorder ("ADHD"). *Id.* at 303. After treatment with medication his condition improved and he was discharged to his mother. *Id.* Dr. Singh found plaintiff's Global Assessment of Functioning ("GAF") score to be 50. *Id.*

#### **Dr. Clifford Corman**

Plaintiff was treated by Clifford Corman, M.D., from October 11, 2012 to September 27, 2013. *Id.* at 306-18. At his initial examination Dr. Corman diagnosed plaintiff with bipolar disorder and ADHD. *Id.* at 318. Dr. Corman's progress notes reflect he prescribed medication, and by February 2013 plaintiff was doing really well, although he continued to struggle. *Id.* at 309-14. The final note from September 27, 2013 states plaintiff was doing fine until he used pot and went off his medications. *Id.* at 307.

#### **Dr. Adamu Salisu**

Adamu Salisu, M.D., treated plaintiff from October 30, 2013 to March 5, 2014. *Id.* at 378-405. Dr. Salisu diagnosed plaintiff as having drug-induced psychotic disorder with delusions and bipolar disorder. Dr. Salisu prescribed medication and psychotherapy. At his initial appointment plaintiff reported, inter

---

they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." *Holohan*, 246 F.3d at 1203 n.1 (internal citations omitted).

alia, feeling that he was raped through the WiiU game by "[t]he people controlling the console." *Id.* at 388. By his December 12, 2013 appointment, Dr. Salisu found plaintiff to be improved with the addition of Trilafon medication, with plaintiff more linear and goal oriented in his thought process. *Id.* at 378-79. Yet at his February 5, 2014 appointment, even though Dr. Salisu noted plaintiff's speech was more linear, plaintiff again reported being raped though the Wii system. *Id.* at 396. Throughout, Dr. Salisu assessed plaintiff's GAF score to be 50. *Id.* at 379, 383, 386, 389, 395, 397, 400, 404.

**Dr. Alejandro Alva**

Plaintiff was treated by Alejandro Alva, M.D., from April 17, 2014 to at least June 15, 2015. *Id.* at 417-41. Dr. Alva diagnosed plaintiff with schizoaffective disorder, a history of ADHD, and polysubstance dependency, with a GAF score of 45. *Id.* at 418. Dr. Alva prescribed medication and therapy.

At his initial visit Dr. Alva found plaintiff was disheveled and unkempt, with soft and halting speech, dyphoric mood, a blunted affect, clear delusional beliefs, bizarre thoughts, auditory hallucinations, appeared distracted, and apparent psychomotor retardation. *Id.* By June 16, 2014, Dr. Alva noted plaintiff had less bizarre thoughts and no longer reported auditory hallucinations, but no other changes. *Id.* at 422. Dr. Alva's examinations continued to reflect these observations through November 24, 2014. *See id.* at 428. Thereafter plaintiff was seen by a physician's assistant, Andrea Shandling, at Dr. Alva's office. On January 26, 2015, PA Shandling reported plaintiff appeared clean, neat, and well groomed, with normal speech, appropriate affect, no delusions, and intact attention span. *Id.* at 430. Her later reports largely continued in the same vein until May 18, 2015. At his May 18 visit PA Shandling found plaintiff to appear just as Dr. Alva did, with unkempt appearance, halting speech, dysphoric mood, blunted affect, clear delusional beliefs, bizarre thoughts, auditory hallucinations, distracted, and apparent psychomotor retardation. *Id.* at 438. Then, at his June 15, 2015 visit, PA

Shandling again found plaintiff to appear well groomed with normal speech and affect, no delusions or hallucinations, and intact attention span. *Id.* at 440.

On June 20, 2015, Dr. Alva completed a mental assessment questionnaire regarding plaintiff. *Id.* at 411-15. Dr. Alva there diagnosed plaintiff with attention deficit disorder and schizoaffective disorder, both continuing, but with his polysubstance abuse in remission. *Id.* at 414. In the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, Dr. Alva found plaintiff to have impairments that ranged from moderate to moderately severe. *Id.* at 411-14.

### b. **Examining Physician**

Psychologist George Popper, Ph.D., examined plaintiff on October 14, 2013, and diagnosed him with paranoid schizophrenia. *Id.* at 354. Dr. Popper found plaintiff appeared adequately groomed with appropriate demeanor, but fearful and anxious that his delusions are real. *Id.* His speech was appropriate, but there were compelling indications of a significant thought disorder, with evident paranoid or delusional thinking, tangential thoughts, and confused ideation. *Id.* Dr. Popper found plaintiff's reality testing to be markedly flawed, and his paranoia and delusions impeded his capacity to function. *Id.* at 355. Although he was reasonably sensitive to social cues, his mood and thought disorder left him likely unable to engage in social interaction. *Id.* Dr. Popper concluded plaintiff's desire to work was "probably very unrealistic at this time," and he was not self-sufficient, was unable to live independently, and was unable to manage his affairs. *Id.*

### c. **Non-Examining Physicians**

### **Dr. P.M. Balson**

On February 27, 2014, P.M. Balson, M.D. reviewed the records then available from Drs. Singh, Corman, Salisu, and Popper, and determined plaintiff to have mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration,

persistence, or pace. *Id.* at 90-94. Dr. Balson found plaintiff was not significantly limited in most respects, but was moderately limited in: understanding and carrying out detailed instructions; maintaining attention and concentration for extended periods; his ability to complete a normal workday and workweek without interruptions; his ability to interact appropriately with the general public and get along with coworkers; and his ability to respond to changes in the work setting. *Id.* at 96-97.

### **Dr. Stephen Fair**

On May 2, 2014, Stephen Fair, Ph.D. reviewed substantially the same records as Dr. Balson did, and determined plaintiff to have mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at 116-19. Dr. Fair found plaintiff was moderately limited in: understanding and remembering detailed instructions; carrying out simple instructions; maintaining attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance, and be punctual; his ability to complete a normal workday and workweek without interruptions; his ability to interact appropriately with the general public and get along with coworkers; his ability to accept instructions and respond appropriately to criticism from supervisors; his ability to maintain socially appropriate behavior and neatness; his ability to respond to changes in the work setting; and his ability to set realistic goals or make plans independently. *Id.* at 121-22. Dr. Fair found plaintiff was markedly limited in his ability to carry out detailed instructions. *Id.* at 121.

### **2.** **The ALJ's Decision**

The ALJ recounted and discussed the foregoing findings and opinions to varying extents. *Id.* at 22-27. Although Drs. Singh, Corman, and Salisu made certain diagnoses and observations, as noted above, they did not opine as to

plaintiff's work limitations and abilities. The others did, and the ALJ specified the weight she gave to each opinion.

The ALJ found the opinions of Drs. Balson and Fair to be "deserving of significant weight" because they were "generally consistent with the medical evidence, as detailed above" in the ALJ's decision. *Id.* at 27. By contrast, the ALJ gave little weight to Dr. Alva's assessment "because the treatment history, including Dr. Alva's office records, does not support the extreme restrictions of the treating psychiatrist <u>and</u> demonstrates improvement with medication compliance (and deterioration when non-compliant)." *Id.* The ALJ also gave little weight to Dr. Popper's opinion "because it is not supported by the evidence in the record, including the claimant's testimony that he had no problems performing his job as usher, concessionaire, and handyman at a cinema and that his 'GM' was happy with his work <u>and</u> examples of the claimant's social interaction." *Id.*

### 3. The ALJ Properly Considered Dr. Alva's Opinion

Because Dr. Alva's opinion was contradicted by the opinions of Drs. Balson and Fair, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for giving it only little weight. *See Lester*, 81 F.3d at 830. As just noted, the ALJ gave two reasons: (1) plaintiff's treatment history, including from Dr. Alva's own office, did not support the extreme restrictions Dr. Alva opined; and (2) plaintiff's treatment history demonstrates his condition improves when he is compliant with his medication regimen and deteriorates when he is non-compliant. AR at 27.

As to the first reason, plaintiff argues it is legally insufficient because the ALJ failed to refer to records showing how Dr. Alva's opinion was extreme or unsupported. P. Mem. at 4. Plaintiff is incorrect; the ALJ supported this reason with specificity. The real issue is whether the ALJ's reasoning is supported by the evidence in the record.

The ALJ noted Dr. Alva found plaintiff to have moderately severe impairments in his ability to interact appropriately with the general public, coworkers or peers, and supervisors (*see* AR at 413), yet Dr. Alva's treatment records contain little to corroborate significant restrictions in this area. *Id.* at 22. This finding is largely born out by the treatment notes, which do not address social interaction issues. Although arguably certain of Dr. Alva's other observations could have led him to conclude plaintiff also would have social problems, the ALJ's finding on this point is nonetheless supported by the record.

The ALJ also found Dr. Alva's opinion that plaintiff had a moderately severe impairment in his ability to maintain attention and concentration for extended periods (*see id.* at 412) to be contrary to PA Shandling's observation on June 15, 2015 – just five days before Dr. Alva gave his mental assessment – that plaintiff's attention span was "intact." *Id.* at 23; *see id.* at 440. Plaintiff argues PA Shandling's observations should be given less weight because, as a physician's assistant, she was not an acceptable medical source. *See* 20 C.F.R. § 1513(d)(1). That is true insofar as PA Shandling purports to offer a medical opinion; however, Shandling's observations are not strictly medical opinions. Moreover, since Dr. Alva apparently did not see plaintiff after November 24, 2014, he presumably relied in part on PA Shandling's notes when preparing his mental assessment of plaintiff on June 20, 2015. Nonetheless, given that Dr. Alva consistently found plaintiff to be distracted when he saw plaintiff between April and November 2014 (*see* AR at 418, 420, 422, 424, 426, 428), and given that Shandling's notes from February and May 2015 also show plaintiff was distracted (*see id.* at 432, 438), Dr. Alva's finding of moderately severe impairment in attention and concentration is in fact supported by plaintiff's treatment records. It is also true, however, that Dr. Alva's opinion does not account for the general improvement in attention noted by PA Shandling, including at plaintiff's examination just before Dr. Alva rendered his opinion.

The ALJ also pointed to treatment notes showing improvement over time with treatment. *Id.* at 25-26. Plaintiff argues that intermittent improvement in his condition does not undercut Dr. Alva's findings. *See Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (where there are mental health issues, "[c]ycles of improvement and debilitating symptoms are a common occurrence"; "it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working") (citing *Holohan*, 246 F.3d at 1205). And there is no question that the treatment notes reflect both improvement and setbacks. But this leads to the second, and more significant, reason given by the ALJ to discount Dr. Alva's opinion: that Dr. Alva's opinion ignored that plaintiff improved when he was compliant with his medication regimen and deteriorated when he was noncompliant.

Dr. Alva and PA Shandling noted plaintiff was compliant with his treatment plan and medication on each of his visits except February 23, 2015. Yet, as recounted by the ALJ (*see* AR at 25-26), their treatment notes also reflect several instances of noncompliance or incomplete compliance – even when they described plaintiff as compliant. On September 29, 2014, Dr. Alva noted plaintiff was only "intermittently compliant with medications," and reflect plaintiff was counseled on the need to take his medications as prescribed to obtain the maximum efficacy. AR at 426. On February 23, 2015, plaintiff told PA Shandling he "occasionally [had] to skip medications" because of work, and once missed some of his medications because he had to work a graveyard shift. *Id.* at 432. And on May 18, 2015, while plaintiff reported taking his medication daily, his mother expressed concern he did not take his morning medication regularly. *Id.* at 438.

Their notes also reflect instances of plaintiff deliberately discontinuing medications on his own, without doctor approval. On March 23, 2015, plaintiff told PA Shandling that Strattera made him dizzy and he did not take it often and

wanted to stop taking it. *Id.* at 434. On May 18, 2015, plaintiff told PA Shandling he did not take Vyvanse one or two days a week, even though he also reported it as helping him focus at work. *Id.* at 438. On June 15, 2015, plaintiff again told PA Shandling he "stopped taking Vyvanse as much and decided to take a week off." *Id.* at 440. Shandling did note, however, that plaintiff seemed more calm and focused without taking Vyvanse. *Id.*

In short, there is substantial evidence to support the ALJ's finding that plaintiff was noncompliant at times with his medication regimen. The closer question is whether the record also reflects plaintiff's condition improved with compliance and deteriorated with noncompliance.

The record generally reflects plaintiff's condition improved with medication, not just as prescribed by Dr. Alva, but also by Drs. Singh, Corman, and Salisu. *See id.* at 303, 309-14, 378-79, 422-25. It is more difficult to tell whether plaintiff's setbacks correspond with periods of noncompliance. Dr. Corman made one such clear finding as the ALJ noted, reporting in September 2013 that plaintiff was doing fine until he used pot and went off his medications, causing him to "flip[] out." *Id.* at 24, 307. Dr. Alva's and PA Shandling's notes in this regard are less clear.

On September 29, 2014, Dr. Alva noted plaintiff's intermittent compliance with medication, but his condition was no worse than at his previous examination on July 21, 2014, when there were no compliance issues reported. *Id.* at 424, 426. Indeed, Dr. Alva assessed plaintiff as "[m]inimally improved" on September 29, 2014. *Id.* at 426. On February 23, 2015, when plaintiff reported skipping medication because of work, his examination yielded largely positive observations, although "[n]o change" in his improvement. *Id.* at 432. On March 23, 2015, when plaintiff admitted he did not take Strattera very often, observations about his condition were largely positive except, confusingly, PA Shandling assessed him to be "[m]inimally worse." *Id.* at 434. The next month, with no compliance issues,

14

plaintiff was again "[m]inimally improved." *Id.* at 436. The clearest correlation from Dr. Alva's office came on May 18, 2015, when plaintiff told PA Shandling he did not take Vyvanse one or two days a week and his mother expressed concern about plaintiff missing morning medications. On that day Shandling's observations from her mental examination reflected significantly worse findings than from plaintiff's previous examination in April, and also reported he was "[m]inimally worse." *Id.* at 438.

Accordingly, the record shows plaintiff had medication compliance issues, and there is some indication his noncompliance led to a deterioration in his condition, particularly as reported by Dr. Corman, but also as reflected in PA Shandling's notes. In addition, although certain of the limitations Dr. Alva opined are to some extent supported by his treatment records, others are not and the ALJ accurately pointed to discrepancies. On balance, the reasons the ALJ gave for giving little weight to Dr. Alva's opinion were specific and legitimate and supported by substantial evidence.

### 4.     The ALJ Properly Considered Dr. Popper's Opinion

As recounted above, Dr. Popper opined, inter alia: plaintiff "is probably unable to engage in social interaction"; and plaintiff's desire to "work and be self-sufficient . . . is probably very unrealistic at this time" as plaintiff "is not self-sufficient and unable to live independently." AR at 355. The ALJ gave this opinion little weight on the ground it was not supported by the evidence in the record, specifically: (1) plaintiff's testimony that he had no problems working as an usher, concessionaire, and handyman at a cinema, and his manager was happy with his work; and (2) examples of plaintiff's social interaction. *Id.* at 27.

Plaintiff testified about his part-time job at the hearing before the ALJ on June 25, 2015. *Id.* at 35, 53. For three or four months in 2013, plaintiff worked at the Regal Cinemas doing work as an usher, handyman, and at concession. *Id.* at 53, 194, 217. He would do whatever the GM wanted him to do, and the GM was

happy with his work. *Id.* at 53. Plaintiff testified he did not have any problems doing his job. *Id.*

Plaintiff argues this past work is irrelevant to whether he is self-sufficient and can live independently because this was a part-time job that did not constitute substantial gainful employment; indeed, he only earned a total of $1,768 in this job. *See id.* at 194, 197. Plaintiff also points out that when he tried to work at a different cinema he was fired for his inability to follow directions. *See id.* at 55-56. Defendant argues that whether plaintiff worked at substantial gainful levels is irrelevant to whether his employment shows he was able to work. Both sides have a point. To the extent Dr. Popper opined plaintiff is unable to be self-sufficient, the fact that he was able to work part time for a few months does little to show he can support himself and does not contradict that portion of Dr. Popper's opinion. But Dr. Popper also opined that plaintiff's desire to work and be self-sufficient is probably unrealistic, and plaintiff's testimony that he was in fact able to work does undercut Dr. Popper's opinion to the extent it suggests plaintiff could not work at all. That plaintiff was fired from employment at a different cinema does not demonstrate there are no jobs he can do, as Dr. Popper possibly suggested.

Further, although plaintiff's part-time work does not directly show he is able to support himself, the ALJ also found Dr. Popper's opinion to be internally contradictory with respect to whether plaintiff can be self-sufficient and live independently. In particular, the ALJ noted that Dr. Popper acknowledged plaintiff said he requires no help with personal care of activities of daily living, but nonetheless found plaintiff is not self-sufficient and unable to live independently. *Id.* at 22, 355.

Dr. Popper also opined plaintiff was probably unable to engage in social interaction. The ALJ found this contrary to "examples of the claimant's social interaction," presumably referring to examples the ALJ discussed elsewhere in her decision. *See id.* at 22, 27. These examples included plaintiff's mother's report

16

that he goes to church and he talks to people every day at home or on the telephone or computer, but does not engage in social activities and has a hard time at gatherings. *Id.* at 267-47, 262. The ALJ also cited to a letter from plaintiff's supervisor at Santa Ana College, who recounted problems plaintiff had in following multiple directions but cited no social problems. *Id*. at 22, 281. The ALJ herself found the evidence showed plaintiff had moderate difficulties in social functioning, but did not support Dr. Popper's more extreme opinion that plaintiff was probably unable to engage in social interaction at all. *Id.* at 22, 27. This was a reasonable conclusion from the record.

Dr. Popper opined plaintiff had extreme restrictions in his ability to socially interact, work, support himself, and live independently, but other evidence in the record indicated he can care for himself, was at times a good employee, and had limited social interactions. Although again a close question, the reasons the ALJ cited for giving Dr. Popper's opinion little weight were specific and legitimate and supported by substantial evidence.

### 5. The ALJ Was Not Required to Consider the GAF Scores Assessed by Dr. Salisu

As recounted above, three doctors founds plaintiff's Global Assessment of Functioning score to be between 45 and 50. In October 2012 Dr. Singh found plaintiff's GAF score to be 50. AR at 303. In April 2014 Dr. Alva found plantiff's GAF score to be 45. *Id.* at 418. And throughout the time Dr. Salisu treated plaintiff from October 2013 to March 2014, Dr. Salisu noted plaintiff had a GAF score of 50. *Id.* at 379, 383, 386, 389, 395, 397, 400, 404. The ALJ specifically noted all of these GAF assessments, including those by Dr. Salisu. *Id.* at 24-25. But plaintiff argues the ALJ failed to properly consider the scores assessed by Dr. Salisu.

A GAF score of 41-50 is indicative of "serious symptoms," such as suicidal ideation or an inability to maintain employment. AMERICAN PSYCHIATRIC

17

ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34
(4th ed. 1994) ("DSM-IV") (describing the GAF scale designed to provide
psychiatrists a method of scoring and comparing patients functional capacity in
light of diagnoses). But GAF scores alone "do not control determinations of
whether a person's mental impairments rise to the level of a disability." *Garrison*,
759 F.3d at 1002 n.4. They are merely a "rough estimate of an individual's
psychological, social, and occupational functioning used to reflect the individual's
need for treatment." *Id.* (citing *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th
Cir. 1998).

Contrary to plaintiff's contention, the ALJ was not required to further
discuss the GAF scores; an "ALJ does not need to discuss every piece of
evidence." *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2006) (internal
quotations and citation omitted). The ALJ therefore did not err in failing to
specifically address plaintiff's GAF scores in Dr. Salisu's reports. *See Hughes v.
Colvin*, 599 Fed. Appx. 765, 766 (9th Cir. 2015) (holding the ALJ did not err in
failing to address a GAF score because "it does not have any direct correlative
work-related or functional limitations") (citing *Vargas*, 159 F.3d at 1164 n.2).

**6.** **The ALJ Properly Credited the Opinions of the State Agency Consultants**

The ALJ gave the opinions of Dr. Balson and Dr. Fair "significant weight,"
finding them "generally consistent with the medical evidence, as detailed above" in
the ALJ's decision. AR at 27. Plaintiff argues the ALJ improperly credited the
state agency consultants' opinions over the treating and examining physicians'
opinions. Specifically, plaintiff argues the ALJ fails to explain how the opinions of
Drs. Balson and Fair are generally consistent with the medical evidence, and those
physicians' opinions should be given less weight because they did not consider Dr.
Alva's findings.

As non-examining physicians' opinions, Drs. Balson and Fair's opinions are generally given the least weight compared to opinions of treating and examining physicians. *Holohan*, 246 F.3d at 1202. "A report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record." *Pitzer v. Sullivan*, 908 F.3d 502, 506 n.4 (9th Cir. 1990). But such opinions may serve as substantial evidence when they are "consistent with independent clinical findings or other evidence in the record" and "supported by other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Morgan*, 169 F.3d at 600. If a non-examining physician's opinion contradicts that of an examining physician but is not based on independent clinical findings, then the ALJ can rely on the non-examining physician's opinion to reject the examining physician's opinion "only by providing specific, legitimate reasons supported by substantial evidence." *Morgan*, 169 F.3d at 600. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* at 600-01 (quoting *Magallanes*, 881 F.2d at 750 (internal citations omitted)).

The ALJ did that here. Contrary to plaintiff's argument, the ALJ set forth in detail the evidence reviewed by Drs. Balson and Fair – specifically, the records of Drs. Singh, Corman, Salisu, and Popper – as well as the records of Dr. Alva, who treated plaintiff after Drs. Balson and Fair rendered their opinions. The ALJ summarized the records, and detailed her interpretations of the findings in those records. *Id.* at 22-26. She concluded plaintiff had largely moderate limitations, consistent with those opined by Drs. Balson and Fair, and rejected the more severe limitations opined by Drs. Alva and Popper, particularly given the differences she found in plaintiff's condition when he is compliant with his medications as opposed to when he is not. The ALJ clearly cited the evidence in the record that she found consistent with Drs. Balson and Fair's opinions.

Plaintiff argues that Drs. Balson and Fair's opinions cannot be substantial evidence because they were based upon incomplete medical evidence. In particular, they rendered their opinions in February and early May 2014, and therefore did not consider Dr. Alva's treatment records from April 2014 through June 2015. But the decision plaintiff cites for this argument, *Celaya v. Halter*, 332 F.3d 1177 (9th Cir. 2003), does not support it. *Celaya* finds a consulting physician's opinion is not substantial evidence where the completed opinion form: (1) stated "no 'treating or examining source statement(s) regarding claimaint's physical capacities' were reviewed"; and (2) consisted of eight checkmarks indicated total lack of disability with no discussion or rationale offered. *Id.* at 1183-84. By contrast, Drs. Balson and Fair did review the medical evidence available at the time they rendered their opinions, and nothing in *Celaya* suggests reviewing physicians' opinions must be disregarded if they are rendered before all the evidence is in. Although Drs. Balson and Fair did not have the benefit of Dr. Alva's treatment notes, the ALJ did and discussed them thoroughly.

Accordingly, the ALJ properly considered the medical evidence and opinions in the record, and did not err in giving significant weight to the opinions of Drs. Balson and Fair and little weight to the opinions of Drs. Alva and Popper.

**B.    The ALJ Properly Discounted the Credibility of Plaintiff's Testimony**

Plaintiff argues the ALJ also failed to properly consider plaintiff's credibility. P. Mem. at 14-16. The ALJ found plaintiff's statements concerning the intensity, persistence, and limited effects of his symptoms were not entirely credible. AR at 27.

An ALJ must make specific credibility findings, supported by the record. SSR 96-7p. To determine whether testimony concerning symptoms is credible, an ALJ engages in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, an ALJ must determine whether a claimant produced objective medical evidence of an underlying impairment "'which could reasonably

be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if there is no evidence of malingering, an "ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281 (citation omitted); *accord Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014). The ALJ may consider several factors in weighing a claimant's credibility, including: (1) ordinary techniques of credibility evaluation such as a claimant's reputation for lying; (2) the failure to seek treatment or follow a prescribed course of treatment; and (3) a claimant's daily activities. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Bunnell*, 947 F.2d at 346-47.

At the first step, the ALJ here found plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged. AR at 27. At the second step, because the ALJ did not find any evidence of malingering, she was required to provide clear and convincing reasons for discounting plaintiff's credibility. The ALJ gave three reasons: (1) plaintiff's statements were not corroborated by his treatment history; (2) plaintiff's daily activities were inconsistent with his allegations of disability; and (3) plaintiff was non-compliant with his medication. *Id.*

In an Adult Function Report completed by his mother, plaintiff claimed to be very forgetful, and to have difficulty paying attention and following written and spoken instructions. *Id.* at 247. At the hearing, plaintiff indicated he was "not the best at keeping track of everything," such as dates. *Id.* at 51, 53. He also testified he got fired from one of his cinema jobs because he could not follow directions, asked the same questions repeatedly, and could not manually do everything the way the employer wanted. *Id.* at 55-56. He also testified that somebody at Regal Cinema said he was "not acting normally" and that a lot of people told him he was "saying and doing things that were a little bit out there." *Id.* at 56, 57. At another

job a family friend got him, plaintiff testified the friend fired him because he could not trust the work plaintiff did, since plaintiff could not follow directions so tasks were not completed. *Id.* at 58. He testified he has been trying to work but none of his jobs work out because he cannot follow directions. *Id.* at 63.

The ALJ concluded plaintiff had only moderate limitations in maintaining concentration, persistence, and pace, and rejected the more severe limitations plaintiff described. *Id.* at 22-24, 27. The first reason the ALJ gave for discounting plaintiff's testimony was that it was not corroborated by his treatment history. *Id.* at 27. The lack of supporting medical evidence alone cannot suffice as the basis for discounting plaintiff's pain testimony. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). But the lack of such evidence can be considered as a factor in an ALJ's credibility analysis. *See id.*; *see also Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (lack of corroborative objective medical evidence may be one factor in evaluating credibility). Here, as discussed above with respect to the ALJ's evaluation of the medical evidence and opinions, the ALJ reviewed plaintiff's treatment history and determined it showed plaintiff had only moderate limitations as Drs. Fair and Balson found. *See* AR at 22-27. Among other things, the ALJ pointed to findings that plaintiff's attention span was intact when he was compliant with medication. *Id.* at 23, 26. This was a clear and convincing reason for discounting the severity of plaintiff's complaints.

The second reason the ALJ gave was that plaintiff's daily activities were inconsistent with his allegations. Inconsistency between a claimant's alleged symptoms and his daily activities may be a clear and convincing reason to find the claimant less credible. *Tommasetti*, 533 F.3d at 1039; *Bunnell*, 947 F.2d at 346. But "the mere fact a [claimant] has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

The Function Report describes plaintiff's activities as including watching TV and movies, going for walks, and going to church. *Id.* at 243. There were no reported difficulties with personal care, but there was an indication plaintiff could not cook. *Id.* at 243-44. He also reported doing household chores such as laundry, taking out the trash, dusting, yard work, and cleaning. *Id.* at 244. He also went shopping occasionally, talked to people at home and on the phone, played sports, and listened to music. *Id.* at 245-46. Various medical reports also describe plaintiff's activities. Plaintiff told Dr. Popper he does not need help with personal care and daily living activities. *Id.* at 355. He also said he swims, exercises, uses the computer, and plays video games. *Id.* at 381, 393.

The ALJ found these daily activities to be inconsistent with plaintiff's allegations because they suggest he could perform appropriate work activities on an ongoing and daily basis. *Id.* at 27. Plaintiff's allegations of disability relate to his inability to follow directions at work. These allegations are not inconsistent with plaintiff's daily living activities. There is no evidence in the record that indicates plaintiff participated in activities where he successfully followed directions. Defendant argues plaintiff's activities show he was not as limited as he claimed, even if they do not show he could work, and this was a proper factor for the ALJ to consider in evaluating his credibility. *See Valentine v. Comm'r of Soc. Sec.*, 574 F.3d at 685, 693 (9th Cir. 2009). That may well be, but that is not what the ALJ stated. The ALJ stated plaintiff's activities show he could perform work activities, and that does not follow. As such, the ALJ's second reason was not clear and convincing.

The third reason the ALJ gave for discounting plaintiff's testimony was his noncompliance with his prescribed medication regimen. This third reason was clear and convincing. As discussed above, there was substantial evidence plaintiff was noncompliant at times with his medication, as well as evidence that this corresponded to some extent with deterioration in his condition. Noncompliance

with prescribed treatment is a proper basis to discount credibility. *See Stenberg v. Comm'r of Soc. Sec.*, 303 Fed. Appx. 550, 552 (9th Cir. 2008) (citing *Tonapetyan*, 242 F.3d at 1147-48).

The ALJ therefore gave two clear and convincing reasons to find plaintiff's allegations regarding his symptoms to be not entirely credible. As such, the ALJ did not err in assessing plaintiff's testimony.

## C.    The ALJ Properly Assessed Plaintiff's Mother's Credibility

Plaintiff also argues the ALJ failed to properly consider statements from plaintiff's mother, Ms. Anna Montoya. P. Mem. at 16. Specifically, he argues the ALJ's reason for rejecting the testimony was not a specific reason. *Id.* at 17. The court finds the ALJ properly considered this testimony.

"[L]ay testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence and therefore *cannot* be disregarded without comment." *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) (internal quotation marks, ellipses, and citation omitted); *see Smolen*, 80 F.3d at 1288; *see also* 20 C.F.R.§§ 404.1513(d)(4), 416.913(d)(4) (explaining that the Commissioner will consider all evidence from "non-medical sources[,]" including "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy"). The ALJ may only discount the testimony of a lay witness if he provides specific "reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *see Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and give reasons germane to each witness for doing so.").

Here, plaintiff's mother submitted a Third Party Adult Function Report that mirrored the one she submitted on plaintiff's behalf. *See* AR at 227-35. The ALJ discounted Ms. Montoya's statements because "the general allegation of disability is not supported by the medical evidence." *Id.* at 28. This was a specific reason

24

germane to Ms. Montoya for rejecting her testimony. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (citing *Lewis*, 236 F.3d at 511) (inconsistency with medical evidence is a germane reason for discrediting the testimony of a lay witness). Accordingly, the ALJ properly rejected Ms. Montoya's statements.

## V.

## CONCLUSION

IT IS THEREFORE ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits, and dismissing the complaint with prejudice.

DATED: November 29, 2018

_____
SHERI PYM
United States Magistrate Judge